UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MAMNOON AHMAD KHAN, | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| SEDGWICK CLAIMS MANAGEMENT SERVICES, INC., KIM HOTTEL, COLLEEN VAN TUYL, DAVE NORTH, MICHAEL ARBOUR, THE CARLYLE GROUP, INC. and NATHAN URQUHART, | * * * * * * | Civil Action No. 1:22-cv-11893 |
| Defendants. | | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

Plaintiff Mamnoon Ahmad Khan ("Plaintiff") filed suit against Sedgwick Claims Management Services Inc. ("Sedgwick"), Kim Hottel, Colleen Van Tuyl, Dave North, Michael Arbour, The Carlyle Group, Inc. ("Carlyle"), and Nathan Urquhart (collectively, "Defendants") claiming discrimination and retaliation under Mass. Gen. Laws ch. 151B.  For the following reasons, Defendants' motion to dismiss, [ECF No. 6], is GRANTED in part and DENIED in part.

I. BACKGROUND

　　A.　　**Factual Allegations**[1]

The following relevant facts are taken primarily from the Complaint, [ECF No. 1-1 ("Compl.")], which the Court assumes to be true when considering a motion to dismiss.  Ruivo v. Wells Fargo Bank, N.A., 766 F.3d 87, 90 (1st Cir. 2014).  Plaintiff is a Brown, Muslim man who

---

[1] The factual recitation is detailed given the statute of limitations analysis that is required.  That being said, the Court omits certain incidents that are not relevant to the claims and that fall outside of the limitations period as determined by the Court.

immigrated to the United States from Pakistan in 1983. [Compl. ¶¶ 9–10]. As described in detail below, Plaintiff claims that in the course of his employment at Sedgwick and its predecessor in interest, York Risk Services Group, Inc. ("York"), he was discriminated against based on his race, national origin and religion and also subject to retaliation and that this discrimination and retaliation "create[ed] a hostile and humiliating work environment." [Id. ¶¶ 12, 84, 89, 94, 98–99].

       1.       <u>August 2014 – September 2019: Discrimination and Retaliation at York</u>

In August 2014, Plaintiff started working as a Claims Examiner at the Braintree, Massachusetts office of York. [Compl. ¶¶ 12–13]. Around that time, another Claims Manager, Steve Gigarjian,[2] degraded and yelled at Plaintiff and made disparaging and racially charged comments to Plaintiff, including calling him "Paki"; saying "'there goes another foreigner' when someone of color from the building walked by"; telling Plaintiff he "would not even know who Clint Eastwood is because of his heritage" and that he "needed to take English classes." [Id. ¶ 15].

Gigarjian was friends with Linda Martin, Plaintiff's manager. [Compl. ¶¶ 14–15]. "A few times," Plaintiff reported Gigarjian's conduct to Martin and told her that the things Gigarjian said "made him feel inferior and that he wanted [them] to stop." [Id. ¶ 16]. Martin said she would talk to Gigarjian, but the comments continued. [Id.].

Nearly two years later, on or about June 24, 2016, Plaintiff was in the lunchroom at work when Gigarjian shoved him, spit at him, and picked up a kitchen knife which he held over his shoulder as he moved towards Plaintiff with the blade facing Plaintiff. [Compl. ¶ 17]. During this incident, Gigarjian "threatened [Plaintiff's] life by telling him he was going to 'take [him]

---

[2] The Complaint also spells Gigarjian's name "Gagarjian." For clarity, the Court uses "Gigarjian" here and throughout this Order.

down, take [him] out, and kill [him],'" and made "racially disparaging remarks to him." [Id.]. Co-workers intervened and someone called the Human Resources department. [Id.]. Both Plaintiff and Gigarjian returned to work later that day. [Id.].

Thereafter, Plaintiff got a call from Elisa Nanni from the Human Resources Department. [Compl. ¶ 18]. Plaintiff explained the incident to Nanni, and in response Nanni told Plaintiff that he would work in an office going forward and should lock the door from the inside. [Id.]. Nanni also told Plaintiff that she would investigate the incident. [Id.].

After the lunchroom episode, when Plaintiff would leave his office, Gigarjian would follow him and "stare at him." [Compl. ¶ 19]. Gigarjian also would wait for Plaintiff in his car in the parking lot. [Id.]. Plaintiff was scared and called Nanni to report these events. [Id.]. Because "[n]othing changed" after that call, Plaintiff called Jessica Sorkin, who was Martin's boss, to report what was happening to him. [Id. ¶¶ 14, 19]. Sorkin told him "something like . . . '[Gigarjian] won't do anything but if he does just call the police.'" [Id. ¶ 19]. At this point, more than a month had gone by since the lunchroom incident and the investigation Plaintiff had discussed with Nanni was still not complete. [Id.].

Months later, in November 2016, Plaintiff was in his locked office when Gigarjian tried to open the door with a screwdriver. [Compl. ¶ 20]. Plaintiff called Nanni, who sent someone to stop Gigarjian. [Id.]. Nanni also told Plaintiff to go home immediately, and that going forward, he would be required to work from home. [Id.]. Gigarjian continued working in the office. [Id.].

Because Plaintiff was required to work from home, he was told that York would send him a computer, scanner, fax, and phone, and that it would also transfer his files so he could efficiently work from home. [Compl. ¶ 21]. Plaintiff did not get most of these items for several

weeks, and did not get his computer hard drive until nearly two months later in January 2017. [Id.]. To do his job, he had to purchase a separate phone. [Id.]. All the while, Gigarjian continued to work in the office. [Id. ¶ 22].

After Plaintiff reported that Martin, did not "handle[] his complaints at all, causing the discrimination and harassment by Mr. Gigarjian to continue," Plaintiff was assigned a new manager, Brian Hanzl. [Compl. ¶ 23]. During this time Plaintiff also worked under Sal DiTomasso, who was friendly with Martin. [Id.]. DiTomasso "treated [Plaintiff] poorly," was "intimidating," and "screamed and yelled" at Plaintiff. [Id. ¶ 24]. He also "retaliated against [Plaintiff] for reporting that Ms. Martin did not take action to stop the harassment." [Id.].

From approximately mid-January 2017 to April 14, 2017, Plaintiff took medical leave because of a "condition caused by the events at work." [Compl. ¶ 25]. When he returned, he did not timely receive his annual performance evaluation and, as a result, did not receive a "merit increase" to his salary. [Id. ¶ 26]. Plaintiff asked about his performance evaluation several times, but his requests were ignored. [Id.]. Plaintiff claims that no other employee received an untimely performance evaluation or a delayed "merit increase[]." [Id.].

On May 10, 2017, approximately a month after returning to work, Plaintiff wrote to Rick Taketa, President and CEO of York, about the discrimination and harassment he experienced and told him that he was "made to feel like a second class citizen." [Compl. ¶ 27]. Mr. Taketa ordered an investigation by two law firms and Plaintiff received "multiple emails and letters" from the law firms asking to speak with him. [Id. ¶ 28]. Plaintiff declined to meet with attorneys from the law firms because "he did not have a lawyer" and the "lawyers [asking to speak with him] were hired by York." [Id.].

4

Seven months later, on December 19, 2017, Plaintiff wrote to Tom Warsop, the new Chairman of York, again explaining the discrimination and harassment he had experienced. [Compl. ¶ 29]. The next day, Plaintiff received an email from Danielle McMahan, the new Executive VP of Human Resources, who arranged a meeting for January 26, 2018 with Jason Hall and Fran Watkins from York's Human Resources Management team. [Id.]. At that meeting, Plaintiff discussed being discriminated against at York. [Id.].

Approximately four months later, in March 2018, Watkins informed Plaintiff that Gigarjian had been disciplined for his actions and that Plaintiff would receive the raise he had been denied. [Compl. ¶ 30]. Plaintiff confirmed at the meeting that he felt safe working from home. [Id. ¶ 31].

Also in March 2018, Plaintiff received a message on Facebook from someone he did not know that included the same racially disparaging and threatening language that Gigarjian had used when they worked together in the Braintree office. [Compl. ¶ 32]. The message scared Plaintiff and, as a result, he asked Nanni to check the IP address to see if the message was from Gigarjian. [Id. ¶ 33]. Nanni told Plaintiff that there was nothing York could do about the message. [Id.].

A year later, on March 25, 2019, Plaintiff wrote McMahan, the Executive VP of Human Resources for York, asking that his title be changed to Complex Claims Examiner, which had been "promised by management" based on his experience and performance evaluations. [Compl. ¶ 34]. In the same email, he explained that he continued to experience discrimination and harassment and that he was "yelled at and treated poorly." [Id. ¶ 35]. In response, McMahan again put Plaintiff in touch with Hall, and Hall and Plaintiff scheduled bi-weekly telephone calls to discuss "how things were going for [Plaintiff]." [Id.]. Despite these calls, there was no

5

continued investigation of the discrimination or the retaliation, and Plaintiff did not receive the promised title change.  [Id.].

        2.        September 2019 – June 2021: Discrimination and Retaliation After Sedgwick Acquires York

Approximately six months later, around September 2019, Sedgwick[3] acquired York. [Compl. ¶ 36].  As a result, Plaintiff started working on all new cases and for new managers. [Id.].  In November 2019, Plaintiff was assigned to report to Defendant Kim Hottel, and Hottel's supervisor, Defendant Colleen Van Tuyl.[4]  [Id.].

Plaintiff identifies several instances of alleged discrimination and retaliation during his time at Sedgwick.  First, in December 2019, Hottel informed Plaintiff that Ray Wilt, a Claims Examiner based in New Jersey, would be his vacation back-up and vice-versa.  [Compl. ¶ 37]. Hottel explained that the two of them could not be on vacation at the same time and that because Wilt celebrated Christmas and Plaintiff did not, Wilt would get priority over Plaintiff for vacation over the Christmas holiday.  [Id.].  Hottel, however, was aware that Plaintiff had already scheduled time off around Christmas and that there would be no conflict because Wilt had already used his vacation time for the year.  [Id.].  Nevertheless, Hottel made clear that in the future, Wilt would get priority in choosing vacations.  [Id.].

Second, approximately four months later, in March 2020, Claims Examiners started working remotely due to the COVID-19 pandemic.  [Compl. ¶ 38].  Sedgwick provided other Claims Examiners with laptop computers that would allow them to participate in Zoom meetings and Microsoft Teams meetings.  [Id.].  Plaintiff's computer did not have a camera or speakers, and Sedgwick did not provide Plaintiff with updated equipment despite repeated requests to

---

[3] Sedgwick was later acquired by Defendant Carlyle.  [Compl. ¶ 12].
[4] The Complaint also spells Van Tuyl's name "VanTuyl."  For clarity, the Court uses "Van Tuyl" here and throughout this Order.

Hottel and Van Tuyl for such equipment. [Id.]. As a result, others could not see or hear Plaintiff in meetings, which kept him from being able to fully participate. [Id.]. More than a year later, in June 2021, Plaintiff contacted Van Tuyl's supervisor while Hottel and Van Tuyl were on vacation and explained that he did not have updated computer equipment. [Id.]. Plaintiff received a new computer within a few days. [Id.].

Third, in November 2020, Plaintiff called Hottel and requested a leave of absence to travel to Pakistan to spend time with and take care of his mother, who was elderly and ill. [Compl. ¶ 39]. Hottel explained that work was busy and that they could not afford to have him take time off. [Id.]. She said that she would talk to Van Tuyl, but that she did not think the request would be approved. [Id.]. Hottel never got back to Plaintiff and his mother passed away in January 2021. [Id.]. Plaintiff alleges that the denial of his request for leave was inconsistent with Sedgwick's policies and the Family Medical Leave Act and "changed his life forever," requiring him to seek and receive medical attention to address the physical and mental impacts of not being able to be with his mother. [Id. ¶ 40].

When his mother passed away in January 2021, Plaintiff requested time off, this time to attend her funeral in Pakistan. [Compl. ¶ 41]. Hottel told Plaintiff she would check with Van Tuyl but she again did not think the request would be approved. [Id.]. Hottel never got back to Plaintiff and he missed his mother's funeral. [Id. ¶¶ 41–42]. There was no business reason for the denial. [Id. ¶ 43]. Plaintiff has suffered emotionally from not being able to attend his mother's funeral, and claims that no "no[n] white, non-Muslim, American born employee has been denied a request to go to their parent's funeral services." [Id. ¶¶ 43-45].

Fourth, between January and May 2021, Hottel called Plaintiff Indian despite knowing he is not Indian. [Compl. ¶ 46].

7

Fifth, Plaintiff provided training to new employees at Defendants Hottel and Van Tuyl's request, but he has never been assigned to be a mentor. [Compl. ¶ 47].

Sixth, on May 4, 2021, Plaintiff requested information about a job opening posted on the Sedgwick job portal. [Compl. ¶ 48]. The individual he contacted from Sedgwick's Talent Acquisition Team told Plaintiff he did not have information about the position and that Plaintiff should contact the manager of the position directly to get more information. This response was inconsistent with Plaintiff's observations about how the Talent Acquisition Team assisted other white, non-Muslim, American born Claims Examiners. [Id.]. Plaintiff contacted a supervisor about the interaction, but the supervisor did not respond to Plaintiff's outreach. [Id. ¶ 49]. Plaintiff then emailed the Managing Director of Colleague Resources, who said she would be in touch. [Id. ¶¶ 50–51]. Plaintiff also emailed an individual in Human Resources, who told Plaintiff that she would get him more information about the job posting. [Id. ¶ 51]. After approximately a week, Plaintiff was informed that the job was not an advancement opportunity as compared to his current role. [Id. ¶ 52].

Later, Plaintiff told Defendant Hottel that he was interested in a promotion in a technical field, and she told him to apply for jobs in other departments, which he understood to mean that "she would not miss him if he left her department." [Compl. ¶ 53]. Similarly, Hottel ignored Plaintiff for promotions despite his being better qualified than the individuals who Sedgwick elevated. [Id. ¶¶ 54–56].

Seventh, and more generally, Plaintiff alleges that since the time he started reporting to Defendant Hottel, including until the time of the filing of the Complaint, Hottel transferred several cases that Plaintiff had worked on to other Claims Examiners. [Compl. ¶ 63]. Often, these cases were near completion and simply needed to be "closed out." [Id.]. When Hottel

transferred the files to another Examiner, that person received the credit for the work, impacting Plaintiff's audits, performance reviews, and merit increases. [Id.].

### 3. June 2021 – Present: Continued Discrimination at Sedgwick[5]

Discrimination and retaliation against Plaintiff continued at Sedgwick after June 2021. First, Plaintiff was discriminated against by Defendants Hottel and Van Tuyl with respect to vacation time. [Compl. ¶¶ 57–62]. Throughout 2021, Plaintiff shared with Hottel that he was saving vacation time to visit his mother's grave in Pakistan, but was ultimately unable to make the trip due to COVID-19. [Id. ¶ 57]. Nevertheless, he intended to use his saved vacation time in December 2021. [Id.]. Although Plaintiff knew other Claims Examiners had taken extended vacations, Hottel informed him that Van Tuyl would have to approve his request to use vacation time in December. [Id. ¶ 58]. Also in December 2021, Plaintiff informed Hottel that he had scheduled an important MRI on December 13, 2021, and that he would need to take that day off. [Id. ¶ 59]. Hottel told Plaintiff that Van Tuyl would need to approve the day off, though Plaintiff was unaware of anyone else being required to get approval to use a PTO day to go to a doctor's appointment. [Id.]. Plaintiff alleges that there is no policy against taking a substantial number of vacation days at once, that he was forced to cancel his MRI because he did not want Hottel to retaliate against him, that he lost six PTO days because he was not allowed to use them in December, and that he was treated differently than his white, non-Muslim, American-born coworkers with respect to vacation time. [Id. ¶¶ 60–62].

Second, in late 2021, Plaintiff received a report from the company auditor that he disagreed with. [Compl. ¶ 64]. Pursuant to company policy, Plaintiff requested a form that would allow him to rebut the results of that audit. [Id.]. Plaintiff was denied the opportunity to

---

[5] As explained below, see infra, the relevant statute of limitations date is June 16, 2021.

file the rebuttal, and he is unaware of any white, non-Muslim or American-born workers being denied the chance to provide a rebuttal in the same situation. [Id.].

Plaintiff raised his claims of discrimination and retaliation with management over the following months. For example, on December 14, 2021, after he was denied the use of his PTO time, Plaintiff wrote an email to Defendant Dave North, Sedgwick's Chairman, and Defendant Michael Arbour, Sedgwick's CEO, explaining that he had continued to experience discrimination at Sedgwick. [Compl. ¶ 65]. Neither responded to his email, [id.], but on December 20, 2021, James Brooks, a Human Resources Manager, contacted Plaintiff about his complaint, [id. ¶ 66.]. Separately, on January 4, 2022, Annette Markel, the Employee Relations Director, contacted Plaintiff to discuss his complaint. [Id. ¶ 67].

On January 24, 2022, Plaintiff emailed Defendant Urquhart who was the Managing Director of Carlyle. [Compl. ¶ 71]. Though Urquhart did not respond directly, a day later, on January 25, 2022, Plaintiff received a call from Jason Hall, a member of the Human Resources Management team, who told Plaintiff that Sedgwick had "dropped the ball a few times," and told him to make a settlement demand to try and resolve his claims against Sedgwick. [Id. ¶ 72]. Plaintiff made the requested settlement demand on January 28, 2022. [Id. ¶ 73].

On February 4, 2022, Plaintiff sent another email to Urquhart which also went unanswered. [Compl. ¶ 75].

In another instance of alleged discrimination, on March 4, 2022, Plaintiff received an announcement of Sedgwick's Most Valued Performers for 2021. [Compl. ¶ 76]. He was not on the list despite excellent performance ratings and complimentary emails from a client. [Id.]. Plaintiff alleges that the failure to include him on the list was "discriminatory and retaliatory,"

and that he received no response to an email he sent to Brooks saying that he felt his absence from the list was "the latest discriminatory act from Sedgwick." [Id.].

In sum, Plaintiff claims that the discrimination and retaliation at Sedgwick has been continuous since the start of his employment in 2014. [Compl. ¶ 78]. In particular, Plaintiff points to Defendant Hottel's "continued hostility towards him, reassigning his cases, holding him to higher standards and double standards, and overall gaslighting him." [Id.].

4. Procedural Background

On April 12, 2022, Plaintiff filed a complaint with the Massachusetts Commission Against Discrimination ("MCAD") naming all Defendants as respondents. [ECF No. 7-1 at 2, 16]. On September 14, 2022, Plaintiff filed the operative Complaint in state court, [ECF No. 8 at 6, 18], raising the following claims against all Defendants: (1) race, national origin, and religious discrimination resulting in a hostile and humiliating work environment in violation of Mass. Gen. Laws ch. 151B (Counts I – III), [Compl. ¶¶ 81–95]; and (2) retaliation resulting in a hostile and humiliating work environment in violation of Mass. Gen. Laws ch. 151B (Count IV), [id. ¶¶ 96-100]. Defendants respond that (1) several of the alleged acts of discrimination and retaliation are untimely because they fall outside of the statute of limitations period; (2) Plaintiff has not pled any actionable misconduct on the part of North, Arbour, and Urquhart; and (3) Plaintiff has not pled any actionable misconduct on the part of Carlyle. [ECF No. 7 at 1–2].

Thereafter, the case was removed to Federal Court. [ECF No. 1]. On November 15, 2022, Defendants moved to dismiss the Complaint. [ECF No. 6]. Plaintiff filed his Opposition on December 7, 2022, [ECF No. 14], and Defendants filed a Reply to the Opposition on December 22, 2022, [ECF No. 17].

## II. MOTION TO DISMISS

### A. Legal Standard

On a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must accept as true all well-pled facts, analyze those facts in the light most favorable to the plaintiff, and draw all reasonable inferences from those facts in favor of the plaintiff. U.S. ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 383 (1st Cir. 2011). Additionally, "a court may not look beyond the facts alleged in the complaint, documents incorporated by reference therein and facts susceptible to judicial notice." MIT Fed. Credit Union v. Cordisco, 470 F. Supp. 3d 81, 84 (D. Mass. 2020) (citing Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011). A complaint "must provide 'a short and plain statement of the claim showing that the pleader is entitled to relief[,]'" Cardigan Mountain Sch. v. N.H. Ins. Co., 787 F.3d 82, 84 (1st Cir. 2015) (quoting Fed. R. Civ. P. 8(a)(2)), and must "set forth factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory[,]" Gooley v. Mobil Oil Corp., 851 F.2d 513, 515 (1st Cir. 1988). Although detailed factual allegations are not required, a complaint must set forth "more than labels and conclusions," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice[,]" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Rather, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Twombly, 550 U.S. at 570).

### B. Analysis

#### 1. Allegations that Survive the Statute of Limitations Period

Under Chapter 151B, "a plaintiff must file an administrative charge with the MCAD . . . within 300 days of the occurrence of the alleged harassing or discriminatory events." White v.

DaVita, Inc., No. 12-cv-10964, 2013 WL 65409, at *6 (D. Mass. Jan. 3, 2013) (citing Mass. Gen. Laws ch. 151B, § 5).  Here, because Plaintiff filed his complaint with the MCAD on April 12, 2022,  [ECF No. 7-1 at 2, 16],[6] for the events underlying his claims to fall within the statute of limitations period, they must have occurred on or after June 16, 2021.

Defendants argue that many of the allegations Plaintiff relies on in bringing his Chapter 151B claim are untimely because they took place before this date.  See supra.  Plaintiff responds that under the continuing violation theory, his allegations regarding events that took place before June 16, 2021 are still timely.  [ECF No. 14 at 2–8].

The continuing violation "doctrine permits a person to seek damages for alleged discrimination occurring outside the usual statute of limitations period if the alleged events are part of an ongoing pattern of discrimination, and there is a discrete violation within the statute of limitations period to anchor the earlier claims."  Diaz v. Jiten Hotel Mgmt., Inc., 671 F.3d 78, 85 (1st Cir. 2012) (quoting Pelletier v. Town of Somerset, 939 N.E.2d 717, 731 (2010)).  To recover for discriminatory acts that occurred outside of the statute of limitations period, a plaintiff must demonstrate that: (1) at least one discriminatory act occurred within the six month limitations period, Ocean Spray Cranberries, Inc. v. Mass. Comm'n Against Discrimination, 808 N.E.2d 257, 266–67 (Mass. 2004); (2) the alleged timely discriminatory acts have a substantial relationship to the alleged untimely discriminatory acts, id.; and (3) "a reasonable person in her circumstances would have refrained from filing a complaint within the limitations period," Shervin v. Partners Healthcare Sys., Inc., 804 F.3d 23, 35 (1st Cir. 2015) (citing Cuddyer v. Stop

---

[6] The Court assumes for purposes of this Motion that Plaintiff has sufficiently "exhaust[ed] the administrative process before filing a civil suit," as required under Chapter 151B.  See Posada v. ACP Facility Servs., Inc., 389 F. Supp. 3d 149, 158 (D. Mass. 2019) (citing Everett v. 357 Corp., 904 N.E.2d 733, 746–47 (2009)).

13

& Shop Supermarket Co., 750 N.E.2d 928, 941–42 (Mass. 2001)). More specifically, regarding the third element, the inquiry is whether a "plaintiff knew or reasonably should have known that [his] work situation was pervasively hostile and unlikely to improve, and, thus, a reasonable person in [his] position would have filed a complaint with the MCAD before the statute ran on that conduct." Bettencourt v. Town of Mendon, 334 F. Supp. 3d 468, 489 (D. Mass. 2018) (citing Cuddyer, 750 N.E.2d at 941–42; see also Shervin, 804 F.3d at 35 (the applicability of the continuing violation doctrine turns on "whether the plaintiff knew or reasonably should have known within the limitations period both that her work environment was discriminatory and that the problems she attributed to that discriminatory environment were unlikely to cease.") (citing Cuddyer, 750 N.E.2d at 942) (also citing Ocean Spray, 808 N.E.2d at 268 (explaining that the limitations period begins when "the employee knew or reasonably should have been aware that the employer was unlikely to afford him a reasonable accommodation")). "As to the likelihood [] of improvement, the question is whether the plaintiff's 'delay in initiating the lawsuit, considered under an objective standard, was unreasonable.'" Shervin, 804 F.3d at 35 (citing Cuddyer, 750 N.E.2d at 942).

For the purposes of this discussion, the Court assumes without deciding that one of the alleged acts that occurred within the statute of limitations period qualifies as discriminatory and is substantially related to alleged acts outside the statute of limitations.[7] This leaves the question

---

[7] Defendants raise for the first time in their Reply that the acts before and after the statute of limitations period began are not sufficiently related for the continuing violation doctrine to apply. [ECF No. 17 at 5]. For purposes of a motion to dismiss, the Court disagrees. Plaintiff alleges that he was discriminated against and retaliated against by Sedgwick and Hottel for the entirety of his employment with Sedgwick—both before and after the limitations period began to run. See, e.g., [Compl. ¶ 78]. This allegation is sufficient to survive a motion to dismiss. See Navarro v. U.S. Tsubaki, Inc., 577 F. Supp. 2d 487, 506 (D. Mass. 2008) (finding hostile work environment claim survived motion to dismiss where "serial non-promotion was a continuation

of whether, for any of the discriminatory and retaliatory acts that occurred outside of the statute of limitations, Plaintiff knew or reasonably should have known that the discrimination and retaliation would not cease, and in light of that, whether a reasonable person in Plaintiff's position would have filed a complaint with the MCAD before the statute ran on that conduct. See Bettencourt, 334 F. Supp. 3d at 489.

Plaintiff argues that his delay in filing the MCAD complaint was reasonable given his attempts "to work out the issues internally, work[] through the ownership change [from York to Sedgwick,] and work[] remotely through the pandemic." [ECF No. 14 at 4]. In addition, with respect to Plaintiff's Complaint against Sedgwick, Plaintiff argues that he was "reasonable to believe that when York was acquired by Sedgwick in September 2019, the discrimination would stop because he worked for new managers on different cases." [Id. at 5]. Assuming for present purposes that Plaintiff fairly believed that the discrimination would stop after York was acquired by Sedgwick, the Court will separately consider whether Plaintiff reasonably refrained from filing an MCAD complaint (1) before September 2019 (*i.e.,* before York was acquired by Sedgwick); and (2) between September 2019 and June 16, 2021.

First, the Court finds a reasonable person in Plaintiff's circumstances would have filed a complaint with the MCAD regarding the incidents at York long before September 2019. See Bettencourt, 334 F. Supp. 3d at 489. Plaintiff's co-worker, Gigarjian, overtly discriminated against and physically threatened Plaintiff because of his race, national origin, and religion for nearly three and a half years—from 2014 to 2018. See [Compl. ¶¶ 13–35]. During this time, York management also retaliated against Plaintiff, in part because of his complaints regarding

---

of [the] unfair treatment and, as such, [was] related thematically to [plaintiff's] allegations of earlier, non-timely harassment by his co-workers").

Gigarjian.  See, e.g., [id. ¶¶ 23–24, 35].  The abuse became so bad that Plaintiff had to take a medical leave of absence in 2017—more than two years after the first incident of discrimination.  [Id. ¶¶ 14–15, 25].  Though it is true that Plaintiff raised the discrimination and retaliation internally to management, which Plaintiff points to as a reason for not bringing his complaint earlier, [ECF No. 14 at 4],[8] York and its managers failed to address the complaints for lengthy periods, see [Compl. ¶¶ 16–17 (two years), 19–20 (months), ¶¶ 33–34 (year)], including a nearly sixth-month period from March 2019 to September 2019, [id. ¶¶ 34–35].  The Court thus finds that a reasonable person in Plaintiff's circumstance would have filed a MCAD complaint against York at several points during Plaintiff's nearly five years at York.  See Bettencourt, 334 F. Supp. 3d at 489 ("Given the gravity and frequency of" physical and verbal abuse, "a reasonable person in [plaintiff]'s position would have known that his rights had been violated").  Thus, Complaint paragraphs 13–35 are untimely.

The Court next considers whether a reasonable person in Plaintiff's circumstances would have filed a complaint with the MCAD in response to the discriminatory and retaliatory acts Plaintiff experienced while working at Sedgwick between September 2019 and June 16, 2021.

When Sedgwick acquired York, Plaintiff started working on all new cases and for new managers.  [Compl. ¶ 36].  A reasonable person in this circumstance could have believed that the discrimination and retaliation would stop with the regime change.  [ECF No. 14 at 4].  Despite the fact that the discrimination and retaliation did not stop over the next approximately one and a half years (September 2019 to June 2021), [Compl. ¶¶ 36–56], the Court finds that a reasonable

---

[8] Plaintiff also says that he did not bring a complaint earlier because: (1) the "ownership change[d] [from York to Sedgwick]"; and (2) Plaintiff had to "work[] remotely through the pandemic."  See [ECF No. 14 at 4].  These facts have no bearing on whether Plaintiff should have brought claims against York long before September 2019.

person, could have refrained from filing a complaint during that period as they "worked through the ownership change [from York to Sedgwick,] and worked remotely through the pandemic." [ECF No. 14 at 4]. Moreover, once Plaintiff started raising his concerns with management in December 2021, management responded and tried to work with Plaintiff to remedy the situation. [Compl. ¶¶ 65–74]. This is further evidence that Plaintiff was reasonable in waiting to bring his claim and trying to solve the issues internally. See Cuddyer, 750 N.E.2d at 941 (purpose of continuing violation doctrine is to avoid "forc[ing]" a plaintiff to "prematurely [] choose litigation as a remedy," and to allow an employer to advance its "legitimate interest in attempting to resolve allegations of harassment short of time-consuming and expensive litigation."). Thus, the Court finds that, at this stage at least, the allegations regarding Plaintiff's time at Sedgwick—paragraphs 36–63—are timely.

        2.       Whether Plaintiff States a Claim Against Defendants North, Arbour, Urquhart

The Court now turns to whether Plaintiff has stated a viable claim against Defendants North, Arbour, and Urquhart.

Chapter 151B "explicitly imposes liability on individuals," Sisco v. DLA Piper LLP, 833 F. Supp. 2d 133, 146 (D. Mass. 2011), including individuals who, for example, "intimidate, threaten, or interfere with another person in the exercise or enjoyment of any right granted or protected by th[e] chapter," Mass. Gen. Laws ch. 151B, § 4(4A), and/or who "aid, abet, incite, compel or coerce the doing of any of the acts forbidden under th[e] chapter," id. §4(5); see also Comley v. Media Plan. Grp., 108 F. Supp. 3d 6, 15 (D. Mass. 2015) (dismissing claims of individual liability under Mass. Gen. Laws ch. 151B against corporate officers who did not participate in the alleged discrimination). To sustain a claim against an individual defendant, Plaintiff must plead facts supporting the elements of a prima facie case against that individual

17

defendant. See Baker v. Columbia Sussex Mgmt., LLC, No. 21-cv-11632, 2021 WL 6137261, at *4–6 (D. Mass. Dec. 29, 2021) (dismissing interference claims under 151B § 4(4A) because plaintiff did not allege that the individual defendants were part of the group that discriminated against her, retaliation claims under 151B § 4(4A) because alleged facts would not "allow the court to infer that any of the individual defendants retaliated . . . or even had the means of doing so," and aiding and abetting claim under 151B § 4(5) because plaintiff failed to plead "that any of the individual defendants participated in depriving her of the right to employment free from discrimination.").[9]

Here, the only claims related to North, Arbour, and Urquhart are that they did not respond to emails from Plaintiff that described his concerns about discrimination and retaliation. [Compl. ¶¶ 65, 71, 75]. It appears, however, that after Plaintiff emailed these individuals, Plaintiff received outreach from members of the human resources department attempting to help remedy the situation. [Id. ¶¶ 66–67, 72]. The reasonable inference from these allegations is that, although these defendants did not respond directly to Plaintiff, they did pass Plaintiff's complaints on to the appropriate individuals within the company. As a result, the Court finds that these defendants did not interfere with Plaintiff's enjoyment of his rights or otherwise participate in any alleged discrimination. Plaintiff therefore has not stated a viable claim against defendants North, Arbour, and Urquhart, and the Complaint is dismissed as to those individuals.

---

[9] Plaintiff argues that because "there is no threshold of 'involvement' for individual defendants to be held liable," the fact that they failed to intervene after he complained to them is sufficient evidence of culpability for his claims against them to survive a motion to dismiss. [ECF No. 14 at 9]. Neither case cited by Plaintiff in support of individual liability, however, supports Plaintiff's contention that there is no "threshold of 'involvement'" for individual liability to attach, and in both cases, unlike here, the individuals in question were alleged to have directly discriminated against the employee. Beaupre v. Cliff Smith & Assocs., 738 N.E.2d 753, 764–66 (Mass. App. Ct. 2000); Dragonis v. Sch. Comm. of Melrose, 833 N.E.2d 679, 681, 683, 691–92, 692 n.30 (Mass. App. Ct. 2005).

3. <u>Whether Plaintiff States a Viable Claim Against Carlyle</u>

Finally, the Court considers whether Plaintiff has stated a viable claim against Carlyle. The only claims related to Carlyle are that Carlyle acquired Sedgwick and that Carlyle's managing director did not directly respond to Plaintiff's emails raising his complaints. [Compl. ¶¶ 12, 71, 75, 79]. Again, it appears that after the outreach to Carlyle's Managing Director, human resources almost immediately reached out concerning Plaintiff's issues. [<u>Id.</u> ¶¶ 71–72]. Thus, for largely the same reasons explained above with respect to North, Arbour, and Urquhart, the Court finds that Plaintiff has failed to state a claim against Carlyle. <u>See</u> <u>supra.</u>

### III. CONCLUSION

Accordingly, the Court grants Defendant's motion to dismiss in part and denies it in part. Paragraphs 13–35 of the Complaint are dismissed as untimely, and the claims against Defendants North, Arbour, Urquhart, and Carlyle are dismissed for failure to state a claim.

**SO ORDERED.**

July 7, 2023                                      /s/ Allison D. Burroughs
                                                  ALLISON D. BURROUGHS
                                                  U.S. DISTRICT JUDGE