UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| MAMNOON AHMAD KHAN, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 22-cv-11893-ADB |
| | * | |
| SEDGWICK CLAIMS MANAGEMENT | * | |
| SERVICES, INC., | * | |
| | * | |
| KIM HOTTEL, and | * | |
| | * | |
| COLLEEN VAN TUYL, | * | |
| | * | |
| Defendants. | * | |
| | * | |

**<u>MEMORANDUM AND ORDER</u>**

BURROUGHS, D.J.

Mamnoon Khan ("Khan" or "Plaintiff") brings this action against Sedgwick Claims

Management Services, Inc. ("Sedgwick"), Kim Hottel ("Hottel"), and Colleen Van Tuyl ("Van

Tuyl") [1] (together, "Defendants").  Before the Court is Defendants' motion for summary

judgment, [ECF No. 90].  For the reasons set forth below, Defendants' motion is **<u>GRANTED IN</u>**

**<u>PART</u>** and **<u>DENIED IN PART</u>**.

---

[1] Khan does not contest summary judgment as to Van Tuyl.  <u>See</u> [ECF No. 105 at 10 n.4].
Accordingly, Defendants' motion is **<u>GRANTED</u>** as to Van Tuyl in her individual capacity.

# I.    RELEVANT BACKGROUND

## A.    Material Facts

The following facts are undisputed except where otherwise noted.[2]

### 1.    Parties

Khan is a Muslim man who moved to the United States from Lahore, Pakistan in the 1980s and later became an American citizen.  [ECF No. 119 ¶ 1].  He has dark brown skin and speaks with a prominent accent indicative of his national origin.  [Id. ¶ 2].  In the fall of 2019, Sedgwick acquired Khan's previous employer, York Risk Services Group, [id. ¶ 5], at which time Khan began working for Sedgwick, [ECF No. 106 ¶ 2].  He remained at Sedgwick until taking a leave of absence in September 2023, [id. ¶ 12], from which he did not return, see [ECF No. 119 ¶ 60].  Hottel was Khan's direct supervisor at Sedgwick from November 2019 until Khan's leave of absence.  [Id. ¶ 9]; [ECF No. 92 ¶ 11].  She, in turn, reported to Van Tuyl.  [ECF No. 106 ¶ 6].  At all relevant times, Khan was the only nonwhite, Muslim, foreign-born employee on Hottel's team.  [ECF No. 119 ¶ 4].

### 2.    Origins of the dispute

_____

[2] The facts presented here are drawn from the parties' combined statement of material facts under Local Rule 56.1, consisting of Plaintiff's Responses to Defendants' Statement of Undisputed Material Facts, [ECF No. 106], Defendants' Response to Plaintiff's Statement of Additional Material Facts, [ECF No. 119], and the documents referenced therein.  There is a discrepancy between the paragraph numbers of Defendants' Statement of Undisputed Material Facts as originally filed by Defendants, [ECF No. 92], and of Plaintiff's response, [ECF No. 106], apparently due to the omission by Plaintiff of a number identifying the paragraph numbered 11 in Defendants' original submission.  This discrepancy is immaterial, as it remains clear how Plaintiff responds to each of Defendants' assertions.  In this order, the Court will cite the paragraphs as numbered in Plaintiff's responses, [ECF No. 106].

Hottel initially spoke of Khan as an excellent employee. Khan's 2019 performance review quotes Hottel describing him as a "life-saver." [ECF No. 106 ¶ 13]. Hottel wrote his 2020 and 2021 performance reviews herself, noting that he "exceeded expectations for delivering excellence," [id. ¶ 14 (2020)], and that he was "extremely dedicated to his job and the client," [id. ¶ 15 (2021)]. She also nominated him for several internal awards, [id. ¶¶ 17–18, 20], writing on one occasion that Khan "personifie[d] the meaning of an 'MVP' on any team," [id. ¶ 20].

By contrast, Khan maintains that his relationship to Hottel deteriorated almost immediately after joining her team. In an affidavit filed with his opposition to Defendants' motion for summary judgment, he says: "It quickly became apparent that Ms. Hottel was making assumptions about me based on my religion and ethnic background," [ECF No. 106-1 ("Khan Affidavit") ¶ 9]; "[Hottel] consistently made me feel like a second-class citizen," [id. ¶ 12]; and "[a]lthough . . . Hottel never told me that she bore any animosity towards me, it seemed from her conduct that there was something about me that she did not like and made her distrustful of me," [id. ¶ 17]. Khan points to several occasions on which he says Hottel mistreated him.

### 3. Undated interference with credit for work

Khan alleges that at some point in his employment, Hottel engaged in certain practices to prevent him from receiving credit for his work. He testified at his deposition that, on many occasions, Hottel transferred files to a different employee, Ray Wilt ("Wilt"), after Khan had worked on them nearly to the point of completion, and that Wilt would then receive credit for those files. [ECF No. 106-4 at 11]. On at least one occasion, in March 2021, Khan alerted Hottel to a file that had been improperly credited to another examiner, and she apologized for her mistake. [ECF No. 106-18 at 2]. Khan further testified at his deposition that although he served as de facto mentor to two colleagues, Ashlee Timeranko and Jeff Campbell, Wilt, rather than

Khan, received credit "on the books" for the mentorship.  [ECF No. 106-4 at 44, 49].  In spite of any obstacles he faced in receiving credit for his work, Khan's performance reviews were overwhelmingly positive, see generally [ECF No. 98-4]; [ECF No. 98-5]; [ECF No. 98-6]; [ECF No. 98-7], and he did well relative to his peers on internal metrics, [ECF No. 98-81 at 2].

### 4. Fall 2019 statement about priority for personal time off

Sedgwick's handbook required personal time off ("PTO") to be scheduled in advance and approved by a manager.  [ECF No. 106 ¶ 111]; [ECF No. 98-69 at 5].  Khan alleged at his deposition, and reiterated in his affidavit, that in December 2019, Hottel informed him that Wilt would receive priority when assigning PTO during the Christmas season because Wilt was Christian.  [Khan Affidavit ¶ 9]; [ECF No. 106-4 at 16].  In practice, however, Khan took time off around Christmas each year, while Wilt did not.  [ECF No. 106 ¶ 73–74]; see also [ECF No. 106-4 at 16–17].

### 5. Fall 2020 and winter 2021 attempts to use PTO

Khan's mother passed away on January 14, 2021.  [ECF No. 106 ¶ 100].  Prior to this, in August 2020, he asked to take PTO from October 14 to November 3, [id. ¶¶ 88–90], and Hottel granted his request, [id.]; see also [ECF No. 106-2 at 33].  Around this time, Hottel made two mistaken statements about where Khan was from.  First, on August 24, 2020, in a message to Van Tuyl about Khan's time off, Hottel stated: "It will take 2–3 days travel time to get to his village one way."  [ECF No. 106 ¶ 89].  Khan is, in fact, from Lahore, [ECF No. 119 ¶ 1], a major global city, see, e.g., Lahore, Britannica (Aug. 29, 2025), https://www.britannica.com/place/Lahore.  A few days later, discussing his visit to his mother over email, Hottel and Khan exchanged the following messages:

Hottel:  Please make sure that you are taking the 3 weeks to go to India.
Khan:  India?  I am not from India?

| Hottel: | I'm so sorry – I didn't mean to offend you.  I thought you said that was where you were travelling to. |
|---|---|
| Khan: | It's OK.  I have wonderful friends from India as well.  My mother and father's parents migrated from India to Pakistan for fear of persecution (past, present and future) for being a minority in India.  My parents never went back to India.  I have never been to India as well. |
| Hottel: | Thanks for this.  You know I have nothing but the greatest respect for you. |

[ECF No. 106 ¶ 91].  Khan visited his mother in October 2020, using the PTO that Hottel had approved, but returned home a week earlier than originally planned.  [Id. ¶ 93].

Khan recalls speaking to Hottel on the phone several times, first in October, when he returned to the United States, and at least one other time in November, to discuss the possibility of taking additional time off to return to Pakistan.  [ECF No. 119 ¶¶ 26, 28]; [ECF No. 106-4 at 19–20].  According to Khan, Hottel told him on both occasions that she could not approve his request without speaking to Van Tuyl, [ECF No. 119 ¶¶ 27, 28]; [ECF No. 106-4 at 19–20], and Khan maintains that he never heard back from Hottel regarding his request for additional time off, [ECF No. 106-4 at 21].  At the time, Khan already had prior approval to take consecutive days off from November 18 to November 25 and several consecutive days at the end of December.  [ECF No. 106 ¶ 88].  At his deposition, however, Khan testified that due to the COVID-19 pandemic, "flights were very hard to get," especially because "[t]here are no direct flights to Pakistan . . . so I ha[d] to look . . . [at] connecting flights."  [ECF No. 106-4 at 22].  After his October trip, Khan did not submit any other written request to visit his mother, see [ECF No. 106 ¶ 99], and he did not see her again before her death in January 2021, see [id. ¶¶ 96–97].

Khan does not remember the day of his mother's passing or the few days after it.  See [ECF No. 106 ¶¶ 101–02].  His brother, Jawad, recalled in his deposition that he was speaking on the phone with Khan when their mother died.  [ECF No. 106-12 at 6].  Jawad was in Pakistan at

his mother's bedside, and Khan was on the phone with him from the United States.  See [id.].

Khan went silent for a period during the call, which led Jawad to believe his brother had fainted.

[Id. at 6–7].  Because Khan was partially incapacitated by the news of their mother's death,

Jawad helped him call Hottel to notify her of his mother's passing using an arrangement that the

brothers apparently had used before: namely, Khan held a second phone to the speaker of the

phone on which he was speaking with Jawad, and Jawad (over the phone) used voice commands

to the second phone to initiate a call to Hottel.  [Id. at 7].  Because of this arrangement, Jawad

was able to overhear the ensuing conversation between Khan and Hottel, during which Khan

explained to Hottel that his mother had died and sought permission to travel home for the

funeral.  [Id. at 8].  Jawad testified that Hottel refused to grant the request over the phone and

said that she would need to speak to her manager.  [Id.].  Hottel has submitted an affidavit

presenting a different version of events.  According to her affidavit, when she spoke with Khan

that day, she explained Sedgwick's bereavement policy and asked whether he intended to travel

to Pakistan for his mother's burial.  [ECF No. 94 ¶¶ 5, 7].  Khan responded that he could not

travel to Pakistan due to COVID-19 restrictions.  [Id. ¶ 6].

Khan then took bereavement leave.  [ECF No. 106  ¶¶ 107–09].  Upon returning, he

exchanged the following emails with Hottel on Thursday, January 21, 2021:

| | |
|---|---|
| Khan: | I decided to come back one day ahead of the time allowed by the company.  Hope it's OK?  Please let me know if you have any questions on any of my files.  Thank you very much for your support. |
| Hottel: | Good morning Mamnoon,<br>It's perfectly fine to return as long as you're comfortable with it. There were no issues with any of your files at all while you were out.  Please let me know if I can do anything for you.  Just ease back into things. |
| Khan: | Thank you Kim.  I appreciate yours and Colleen's support and thoughtfulness. |

[Id.]; [ECF No. 98-66].

### 6.    2020 and 2021 attempts to resolve technology issues

Khan, who worked remotely throughout his employment, [ECF No. 106 ¶ 11], had issues

with the computer that Sedgwick provided.  On his old computer, according to Khan: "[I]t often

took several minutes for me to simply open a document on my system.  I was also not able to

fully participate in remote meetings, as I was not provided a camera or microphone."  [Khan

Affidavit ¶ 13].  In an email from July 2021, Khan describes his problems:

> I am having a very hard time in working with my very old computer.  It takes
> forever to download emails, open emails, open SIR documents.  I subscribe to 1200
> mbps from Xfinity but on Sedgwick computer I only get 15 mbps- with this you
> can imagine how old my computer is.   All my colleagues have the latest
> computers/laptops.  If my colleagues can do something in one minute, the same
> task takes me 15 minutes plus. . . .
>      I cannot talk in any team meetings because my computer does not have a
> mic.  I cannot attend Zoom meetings as my computer does not have a camera.

[ECF No. 106-10 at 4].  Khan claims that he observed colleagues fully participate in remote

meetings using audio and video functionality, and that when they shared their screens, he saw

them open large files "quickly and easily."  [Khan Affidavit ¶ 14].  At his deposition, Khan

testified that he first asked for new computer equipment in 2020, [ECF No. 106-4 at 52], and that

Hottel and Van Tuyl "totally ignored" his requests until he requested a new computer from Van

Tuyl's supervisor in July 2021, on a day when both Hottel and Van Tuyl were out.  [Id. at 53].

Khan ultimately received a new laptop in August 2021.  [ECF No. 106 ¶ 83].  Hottel's affidavit

states that nobody on her team had use of a camera or microphone until new laptops were

distributed in 2021.  [ECF No. 94 ¶ 4].  At her deposition, Van Tuyl stated that Sedgwick policy

was only to replace computers that had "completely fail[ed]," meaning that a person could not

log into the computer at all, [ECF No. 106-2 at 36].  An affidavit from Sedgwick's director of IT,

Ronald Vanover, further explains that new computer equipment was "rolled out" in order of the

age of the employee's previous computer.  See [ECF No. 97 ¶ 3].

### 7.    December 2021 PTO

Khan was dedicated to his work and often needed to be reminded to use his PTO days. See [ECF No. 106-15 at 3–4]; [ECF No. 106-14 at 2]; [ECF No. 106-16 at 2].  In December 2021, Khan had reserved a significant amount of PTO, which meant he would be working for a total of seven days in the entire month.  See [ECF No. 106 ¶¶ 116–18].  On Monday, December 6, 2021, Hottel emailed Khan to call his attention to the fact that he still had additional PTO time that would be lost if he did not use it.  [ECF No. 106-17 at 6].  Khan responded on Tuesday, December 7: "If it's OK with you I just scheduled from 12/13 to 12/16- it may not cover all my PTO time, but whatever my PTO is lost is lost."  [Id.].  Hottel responded the following day that she would need to discuss his request for additional time off with Van Tuyl, because if granted, the time off would place Khan "on PTO for the entire month of December—4 consecutive weeks."  [Id.].  Hottel further stated that she would be on PTO until the start of the next week and would not be able to address his request until then.  See [id.].  Khan responded promptly with two emails.  The first asked whether he should come to work on Monday, given that Hottel would not be able to approve his PTO before then, but then the second email said, "You can disregard it.  I will come to work on 12/13 to 12/16.  It's fine, that I will [lose] my PTO days."  [Id. at 5].  At 11:29 p.m., Hottel replied to say that she had spoken with Van Tuyl, and asked Khan to report to work the following Monday but did not address whether he could take off Tuesday or Wednesday.  [Id. at 4].  At 6:30 a.m. on Thursday, December 9, Khan wrote back, "I will work from 12/13 to 12/16- I already cancelled the request."  [Id.].

One day later, on Friday, December 10, Khan emailed again:

Kim-
My doctors and I were desperately trying to get an MRI scheduled on an urgent basis.  Every hour was important and not even the days.  It is a specialized kind of MRI for which only few places in Boston and Providence carries the machines.  My

> specialists were able to schedule the MRI for this Tuesday.  I expedited everything based on your email of 12/16.  But then you ordered that I report to work Monday despite . . . my PTO time.  I, therefore had to cancel this extremely perhaps, life altering MRI.

[Id. at 3].  Hottel wrote back the next Monday, emphasizing that she did not know Khan had a medical appointment, that the decision to cancel it was his alone, and that he had made that decision before receiving a response from her concerning his requested time off for that Tuesday. [Id. at 2].

### 8.    Formal complaint

Khan's earliest potential reference to discrimination in the record can be found in an email thread with Van Tuyl that began on Monday, October 12, 2020.  [ECF No. 106-24 at 3]. He wrote to Van Tuyl that "lately I have started to feel extremely insecure. . . .  It is extremely disheartening lately the way I am being treated.  Perhaps when you have some time we can talk?"  [Id.].  Van Tuyl forwarded the email to herself, noting that she spoke to Khan and that he may have felt that his "ethnic background" was "causing him to be picked on."  [Id. at 2].  Khan does not appear to have followed up on these concerns.  On March 10, 2021, he wrote in a self-evaluation, "It's an honor to be working for my manager, Kim and Director, Colleen.  Both of them are great motivators and provide excellent support for all colleagues.  I feel lucky to be working for Kim and Colleen."  [ECF No. 106 ¶ 110].  Khan notes in his affidavit, however, that throughout this time, although he felt Hottel was treating him unfairly, he "thought it would be best to keep a positive attitude and tried to express gratitude at every chance [he] could."  [Khan Affidavit ¶ 19].

By December 2021, however, Khan felt he "had no other choice than to make a formal complaint of discrimination."  [Id. ¶ 20].  On December 14, 2021, Khan wrote to Sedgwick executives by email:

> Dear Mr. North and Mr. Arbour:
> I never thought that I would ever have to write to you. Unfortunately, I am continuously . . . a victim of harassment, discrimination and retaliation from Sedgwick due to my race, religion, ethnicity.

[ECF No. 98-82 at 2]. This email was treated as a complaint to senior leadership and assigned to Sedgwick Employee Relations Director Annette Markel for investigation. [ECF No. 106-8 at 10]. Markel interviewed Khan on January 5, 2022. [Id. at 11]. During her deposition, Markel stated that Khan expressed to her that Hottel was treating him poorly and provided examples, which Markel did not specify. [Id. at 13]. Khan's affidavit asserts that Markel was rude to him and that she stated that "she would never make final findings that would hurt Sedgwick financially." [Khan Affidavit ¶ 21]. Next, Markel interviewed Hottel, who told her that Khan was egomaniacal and difficult, but also that he was a good performer. [ECF No. 106-8 at 14]. Markel apparently interviewed several other Sedgwick employees as well. See generally [ECF No. 106-7]. On January 24, 2022, Markel issued her summary of findings, [ECF No. 98-83], which concluded that Khan's allegations of discrimination, harassment, retaliation, and unprofessional behavior "[did] not appear to be confirmed." [Id. at 10–11].

### 9. Alleged retaliation

Khan alleges that following Markel's report, his "work conditions further deteriorated." [Khan Affidavit ¶ 22]. The evidence on this point is somewhat thin. Khan's affidavit states that Hottel began assigning Khan complex tasks with immediate deadlines, although neither in the affidavit nor elsewhere does he identify any specific tasks or deadlines, and it further states that others around him were promoted while he "seemed blocked from achieving any advancement within Sedgwick." [Id.]. Khan did, at some point, speak to Hottel and Van Tuyl about finding an advancement opportunity within Sedgwick. [ECF No. 119 ¶ 43]. Between September 23, 2021, and February 22, 2022, Sedgwick posted openings for three Team Lead positions. [ECF

No. 106 ¶¶ 136, 141, 146].  Nobody contacted Khan to encourage him to apply for these roles,

see [ECF No. 119 ¶ 49]; [ECF No. 106-2 at 43–44], and Khan did not, ultimately, apply for any

of them, [ECF No. 106 ¶¶ 138, 143, 148].  Van Tuyl testified at her deposition that had he

applied, she would have interviewed him.  [Id. ¶ 150].  These positions were ultimately filled by

other internal candidates who had the same title as Khan.  [Id. ¶¶ 135–49].

At his deposition, Khan testified that he did apply for other jobs at Sedgwick, but that

Hottel never approved his applications in the internal portal.  [ECF No. 106-4 at 51].  An email

from a senior vice president at Sedgwick on April 15, 2022, appears to reference an application

from Khan for an internal position, the status of which was "still waiting on supervisor approval"

at the time that the position was offered to another employee.  [ECF No. 106-21 at 4].  Hottel, on

the other hand, stated at her deposition that she recalled being notified that Khan had applied to

one position, and that she approved Khan's application when prompted.  [ECF No. 106-3 at 39].

In August 2023, Khan sought help with technological issues that were preventing him from

receiving notifications of new postings from the Sedgwick portal.  [ECF No. 106-4 at 51]; [ECF

No. 106-22 at 3]; [ECF No. 106-23 at 2–3].

### B.    Procedural History

On April 12, 2022, Khan filed a complaint with the Massachusetts Commission Against

Discrimination, [ECF No. 7-1 at 2, 16], and on September 14, 2022, he filed the operative

Complaint in state court, [ECF No. 8 at 6–18].  Defendants removed the case to federal court,

[ECF No. 1], and moved to dismiss, [ECF No. 6].  On July 7, 2023, the Court partially granted

Defendants' motion to dismiss, dismissing as untimely claims arising from Khan's employment

before York was acquired by Sedgwick and dismissing claims against some named defendants

for failure to state a claim.  [ECF No. 19 at 19].  The remaining defendants, which included

11

Sedgwick, Hottel, and Van Tuyl, answered on July 19, 2023.  [ECF No. 22].  On February 14, 2024, the parties filed a joint motion to stay proceedings pending mediation, which the Court granted.  [ECF Nos. 33, 34].  A mediation did not happen, [ECF No. 50], and the Court lifted its stay on July 2, 2024, [ECF No. 51].  Following discovery, Defendants filed the instant motion for summary judgment on May 1, 2025.  [ECF No. 90].

## II.    LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue is considered "genuine" when "the evidence of record permits a rational factfinder to resolve it in favor of either party."  Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 4–5 (1st Cir. 2010) (citing Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).  A fact is considered "material" when "its existence or nonexistence has the potential to change the outcome of the suit."  Id. at 5 (citing Martínez v. Colón, 54 F.3d 980, 984 (1st Cir. 1995)).

"To succeed in showing that there is no genuine dispute of material fact, the moving party must direct [the Court] to specific evidence in the record that would be admissible at trial."  Ocasio-Hernández v. Fortuño-Burset, 777 F.3d 1, 4 (1st Cir. 2015).  "That is, it must 'affirmatively produce evidence that negates an essential element of the non-moving party's claim,' or, using 'evidentiary materials already on file . . . demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial.'"  Id. at 4–5 (quoting Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000)).  Once the moving party has laid out its basis for summary judgment, the burden shifts to the party opposing summary judgment to demonstrate, "with respect to each issue on which she would bear the burden of proof at trial, . . . that a trier of fact

could reasonably resolve that issue in her favor." Borges, 605 F.3d at 5 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).

On a motion for summary judgment, the Court reviews "the entire record in the light most hospitable to the party opposing summary judgment." Podiatrist Ass'n v. La Cruz Azul de P.R., Inc., 332 F.3d 6, 13 (1st Cir. 2003) (quoting Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990)). Where inferences are to be drawn from the proffered facts, those inferences "must be viewed in the light most favorable to the party opposing the motion." Oleskey ex rel. Boumediene v. U.S. Dep't of Def., 658 F. Supp. 2d 288, 294 (D. Mass. 2009) (quoting Founding Church of Scientology of Wash., D.C., Inc. v. Nat'l Sec. Agency, 610 F.2d 824, 836 (D.C. Cir. 1979)). The Court, however, "safely may ignore 'conclusory allegations, improbable inferences, and unsupported speculation.'" Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003) (quoting Medina-Muñoz, 896 F.2d at 8).

## III.     DISCUSSION

Khan brings four claims against Defendants pursuant to Mass. Gen. Laws ch. 151B: discrimination on the basis of race (Count I), discrimination on the basis of national origin (Count II), discrimination on the basis of religion (Count III), and retaliation (Count IV). [ECF No. 1-1 ("Compl.") ¶¶ 81–100].

### A.     Claims against Hottel as an individual

At the outset, the Court must distinguish Khan's claims against Sedgwick from those against Hottel in her individual capacity. Chapter 151B primarily establishes liability for employers, either for their own actions or for the actions of their agents, not for individuals. See Mass. Gen. Laws ch. 151B, § 4(1). Although the statute's main focus is on employers,

13

individuals may be liable under section 4(4A) which prohibits "coerc[ion], intimidat[ion], threat[s], or interfer[ence] with" another person in the exercise of any "right granted or protected by this chapter," and section 4(5), which prohibits "aid[ing], abet[ting], incit[ing], compel[ling] or coerc[ing]" another person who engages in acts prohibited under the chapter, id. § 4(5).

Khan's allegations against Hottel are coterminous with his primary allegations of discrimination, so aiding and abetting liability under section 4(5) is not appropriate.[3] Nevertheless, Khan's individual claims against Hottel survive, if barely, pursuant to section 4(4A). Courts have repeatedly endorsed the proposition that, pursuant to section 4(4A), "an individual employee may be held liable for conduct that interferes with rights protected under Chapter 151B." Posada v. ACP Facility Servs., Inc., 389 F. Supp. 3d 149, 157 (D. Mass. 2019) (citing Beaupre v. Cliff Smith & Assocs., 738 N.E.2d 753, 764–65 (Mass. App. Ct. 2000)). The right to a work environment free from discrimination and retaliation is protected by Chapter 151B. See Thomas O'Connor Constructors, Inc. v. Mass. Comm'n Against Discrimination, 893 N.E.2d 80, 86 (Mass. App. Ct. 2008) ("[T]he right to work in an environment free from unlawful racial harassment is unquestionably among the rights encompassed by the statute."). Thus, if a person's individual conduct amounts to discrimination or retaliation, that person may be held personally liable under section 4(4A) for interfering with another's right to be free from such treatment. Khan's individual claims against Hottel may continue, and they will rise or fall on the adequacy of his core claims of discrimination and retaliation.

**B.    Construing Khan's reference to a hostile work environment**

---

[3] A claim under section 4(5) must allege a "wholly individual and distinct wrong" that is "separate and distinct from the claim in the main." Sisco v. DLA Piper LLP, 833 F. Supp. 2d 133, 150 (D. Mass. 2011) (quoting Harmon v. Malden Hosp., 19 Mass. Discrim. L. Rep. 157, 158 (Mass. Comm'n Against Discrimination 1997) (Single Comm'r)).

In his discrimination claims, [Compl. ¶¶ 81–95], and in his retaliation claim, [id. ¶¶ 96-100], Khan refers to a hostile and humiliating work environment.  He does not articulate a separate legal basis for his hostile work environment claim; nor does he indicate how it is distinct from his general Chapter 151B claims.  Therefore, the Court will construe the allegation of a hostile work environment as a particular theory of liability under Chapter 151B.  See, e.g., Cuddyer v. Stop & Stop Supermarket Co., 750 N.E.2d 928, 937 (Mass. 2001) (observing that "when linked together, . . . seemingly disparate incidents may show a prolonged and compelling pattern of mistreatment that have forced a plaintiff to work under intolerable . . . conditions" (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993))).

### C.    Counts I to III: Discrimination

Chapter 151B prohibits employers and their agents from "discriminat[ing] against . . . [an] individual in compensation or in terms, conditions or privileges of employment, unless based on a bona fide occupational qualification" on the basis of protected traits, including race, religious creed, and national origin.  Mass. Gen. Laws ch. 151B, § 4(1).  There are four elements to a Chapter 151B claim: "membership in a protected class, harm, discriminatory animus, and causation."  Sullivan v. Liberty Mut. Ins. Co., 825 N.E.2d 522, 530 (Mass. 2005) (citing Lipchitz v. Raytheon Co., 751 N.E.2d 360, 368 (Mass. 2001)); Dusel v. Factory Mut. Ins. Co., 52 F.4th 495, 503 (1st Cir. 2022) (citing Sullivan, 825 N.E.2d at 530).  "Direct evidence of [the latter two] elements . . . rarely exists," Sullivan, 825 N.E.2d at 530, so Massachusetts courts permit plaintiffs to "establish one or both [of those elements] . . . by indirect or circumstantial evidence using the familiar three-stage, burden-shifting paradigm first set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–05 . . . (1973)."  Id.

In interpreting Chapter 151B, Massachusetts courts "often look to case law construing the analogous Title VII of the Civil Rights Act of 1964," Yee v. Mass. State Police, 121 N.E.3d 155, 162 (Mass. 2019); see also Wheatley v. American Tel. & Tel. Co., 636 N.E.2d 265, 268 (1994) ("It is our practice to apply [f]ederal case law construing the [f]ederal anti-discrimination statutes in interpreting [Chapter 151B].");  Flagg v. Alimed, Inc., 992 N.E.2d 354, 362 (Mass. 2013) (reiterating the principle).  At times, however, Massachusetts courts "interpret [Chapter 151B] to provide more protection against employment discrimination than Title VII, in part because of the [state legislature's] direction that [Chapter 151B] is to be applied liberally."  Yee, 121 N.E.3d at 164 (citing Mass. Gen. Laws ch. 151B, § 9; Cuddyer, 750 N.E.2d at 939–40).

The Court considers each element of a successful Chapter 151B claim in turn.

### 1.    Membership in a protected class

Khan's membership in the relevant protected classes is not disputed; the parties agree that he is nonwhite, was not born in the United States, and practices Islam.  [ECF No. 119 ¶¶ 1–2].

### 2.    Harm

Khan has produced sufficient evidence of harm to survive summary judgment.  The "remedial scope of [Chapter] 151B" is limited to adverse employment actions.  Yee, 121 N.E.3d at 161.  The phrase "adverse employment action" distinguishes "effects on working terms, conditions, or privileges that are material, and thus governed by the statute . . . [from those that are] trivial and so not properly the subject of a discrimination claim."  Id. at 162 (quoting King v. City of Boston, 883 N.E.2d 316, 323 (Mass. App. Ct. 2008)).  An adverse employment action only occurs when "objective aspects of the work environment are affected," Yee, 121 N.E.3d at 162 (quoting King, 883 N.E.2d at 323), in a manner that is "objectively apparent to a reasonable person in the employee's position; 'subjective feelings of disappointment and disillusionment'

will not suffice," id. (quoting MacCormack v. Boston Edison Co., 672 N.E.2d 1, 8 (Mass. 1996)).

The "quintessential adverse employment action" is termination, Rios v. Centerra Grp. LLC, 106 F.4th 101, 113 (1st Cir. 2024), but Khan does not claim to have been improperly terminated. Rather, he challenges treatment that he received during his employment. Reviewing the record in light of the legal standard at summary judgment, the Court finds Khan has shown a genuine issue of material fact as to whether:

- His work product and mentorship were incorrectly credited to other employees. [ECF No. 106-18 at 2]; [ECF No. 106-4 at 49].

- Certain of his attempts to use PTO were delayed indefinitely awaiting managerial approval, thus preventing him from using the time off. [ECF No. 119 ¶¶ 26, 28]; [ECF No. 106-4 at 19–21]; see also [ECF No. 106-12 at 7–8].[4]

- His computer, unlike computers provided to other employees, slowed his work and prevented him from fully participating in virtual meetings. [Khan Affidavit ¶ 13]; [ECF No. 106-10 at 4–5]; [ECF No. 106-4 at 52–53].

- Hottel withheld approval for some applications in Sedgwick's internal careers portal. [ECF No. 106-4 at 51]; [ECF No. 106-21 at 4].

Such treatment would likely affect "objective aspects of the work environment," Yee, 121 N.E.3d at 162 (quoting King, 883 N.E.2d at 323), including Khan's "wages, bonuses, benefits, or ability to perform [his] duties," see Swallow v. Fetzer Vineyards, 46 Fed. Appx. 636, 646 (1st

---

[4] The Court notes that in December 2021, Khan withdrew his own PTO request shortly after submitting it and before Hottel had a chance to approve or deny it. As such, his PTO-related claims will be limited to his requests in fall 2020 and winter 2021.

Cir. 2002), and therefore, if proven at trial, could satisfy the harm requirement of a Chapter 151B claim.[5]

### 3.    Animus and causation

Having shown his membership in a protected class and a genuine issue of material fact on the question of harm, to survive summary judgment, Khan must also show that there is a genuine issue of material fact as to animus and causation, such that a reasonable trier of fact could find for him at trial.

Khan contends that certain interactions provide direct evidence of impermissible animus by Hottel.  First, he claims that in 2019, Hottel told him that Wilt would receive priority when assigning PTO around Christmas because Khan did not celebrate the holiday.  [Khan Affidavit ¶¶ 9, 10]; [ECF No. 106-4 at 16].  Next, it is undisputed that in the summer of 2020, Hottel wrote, in two separate emails, that Khan was from a village, [ECF No. 106 ¶ 89], and that he was from India, [id. ¶ 91].  Finally, when interviewed by Markel, after Khan had alleged discrimination against her, Hottel called him "egomaniacal," "manipulative," and "very difficult."  [ECF No. 106-8 at 14].

---

[5] Because Massachusetts courts construe Chapter 151B at least as broadly as its federal equivalents, this conclusion is strengthened by the fact that a variety of fact patterns have satisfied the adverse action requirement under the analogous federal statute:

> '[T]erms, conditions, or privileges' is pretty open-ended language.  It obviously includes opportunities that are not strictly entitlements, Hishon v. King & Spalding, 467 U.S. 69, 75–76 . . . (1984) (promotion to partner); and a number of cases have extended coverage to slights or indignities that might seem evanescent, e.g., McKenzie v. Illinois Dep't of Transp., 92 F.3d 473, 484 (7th Cir. 1996) (employee given tedious minor duties); Aviles-Martinez v. Monroig, 963 F.2d 2, 6 (1st Cir. 1992) (daily ridicule in clients' presence).
> . . . .
> . . . [W]e cannot accept the . . . view that a refusal to transfer is automatically outside Title VII.

Randlett v. Shalala, 118 F.3d 857, 862 (1st Cir. 1997).

Even drawing all reasonable inferences in Khan's favor, these statements do not show a discriminatory animus causally related to any of the harms Khan alleges. First, Khan does not dispute that he took PTO around Christmas each year, [ECF No. 106 ¶ 73], thus precluding any finding of harm related to Hottel's alleged statement that Wilt would receive priority for PTO. Second, while the statements in Hottel's emails about Khan's background reflect mistaken assumptions, they do not support an inference that she possessed animus against Khan, particularly considering each statement in the context of the email in which it was made. In the first, Hottel was advocating to Van Tuyl for Khan's "need to take 3 weeks PTO" because of the travel time he would need to visit his mother, [ECF No. 106 ¶ 89], and in the second, she was encouraging Khan to "make sure that you are taking the 3 weeks" off, [id. ¶ 91]. Finally, while Hottel's interview by Markel may indicate that she disliked Khan's personality, they do not suggest animus on the basis of a protected class.

In the absence of direct evidence of discriminatory animus, Khan is left with the burden-shifting approach of McDonnell Douglas. Khan must first establish a prima facie case of discrimination. McDonnell Douglas, 411 U.S. at 802. The purpose of the required prima facie showing is to "'eliminat[e] the most common nondiscriminatory reasons for the [adverse employment action],' thereby creating a presumption of discrimination." Blare v. Husky Injection Molding Sys. Bos., Inc., 646 N.E.2d 111, 115 (Mass. 1995) (citation omitted) (quoting Tex. Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 254 (1981)). "It is meant to be a 'small showing' that is easily made." Trs. of Health & Hosps. v. Mass. Comm'n Against Discrimination, 871 N.E.2d 444, 451 (Mass. 2007) (quoting Che v. Mass. Bay Transp. Auth., 342 F.3d 31, 38 (1st Cir. 2003)).

19

When, as here, a person alleges adverse employment action other than termination or rejection, the required prima facie showing depends on the facts and the nature of the alleged discrimination.  See Sullivan, 825 N.E.2d at 530 n.13.  In this case, Khan "must simply produce sufficient evidence that [Defendants'] actions, 'if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.'"  Id. at 530 (quoting Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978)); see also King, 883 N.E.2d at 323 ("In addition, [Plaintiffs] are required to present at least some evidence that would warrant a finding that a discriminatory animus was at work in bringing about the adverse employment action.").  Khan may either provide a similarly situated comparator or introduce some "evidence that . . . [the adverse action] occurred in circumstances that would raise a reasonable inference of unlawful discrimination." Sullivan, 825 N.E.2d at 533–34; see Trs. of Health & Hosps., 871 N.E.2d at 451.  In light of Khan's status as the only person on Hottel's team possessing his protected identities, his testimony that others on his team did not encounter the same difficulties he did, and the legislative instruction to interpret Chapter 151B liberally, Yee, 121 N.E.3d at 164 (citing Mass. Gen. Laws ch. 151B, § 9; Cuddyer, 750 N.E.2d at 939–40), the Court will assume that Khan's showing is sufficient under the first stage of the McDonnell Douglas framework.

Next, the burden shifts to the defendants to articulate a nondiscriminatory reason for the adverse actions alleged by the plaintiff, Dusel, 52 F.4th at 504, which they largely fail to do. Both in their memorandum in support of summary judgment and in their reply to Khan's opposition, Defendants devote much ink to attacking the credibility of Khan's evidence, using phrases like "pure fabrication," [ECF No. 91 at 7], but they provide little in the way of valid nondiscriminatory reasons that would explain their alleged conduct.  At the summary judgment stage, the Court does not weigh the evidence but asks only whether the nonmoving party can

show a genuine issue of material fact.  Here, the fact that Khan and Sedgwick present two materially different versions of events precludes summary judgment.

The one instance in which Defendants do provide a nondiscriminatory explanation for their alleged actions concerns Khan's technology woes: Sedgwick explains that it distributed replacement laptops in 2021 based on how old an employee's laptop was, and the parties agree that prior to the distribution, nobody had video or audio access.  [ECF No. 118 at 10–11]; [ECF No. 97 ¶ 3]; [ECF No. 106 ¶ 79].  As such, on this claim, the burden shifts back to Khan to produce evidence that the reason provided was a pretext.  Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., 50 N.E.3d 778, 794 (Mass. 2016).  Khan testified that he asked for new equipment in 2020, and that Hottel and Van Tuyl ignored that request, despite the fact that Khan, unlike other examiners, worked remotely throughout the relevant time period.  Further, he has produced evidence that he only received a new laptop after requesting one from Van Tuyl's supervisor, and after at least one other colleague had already received one.  By introducing some evidence that Hottel and Van Tuyl ignored his earlier request and delayed the eventual delivery of his equipment, Khan has done just enough to survive summary judgment on this point.

### D.    Count IV: Retaliation

Chapter 151B, section 4(4) prohibits a person or employer from "discharg[ing], expel[ling], or otherwise discriminat[ing] against any person because he has opposed any practices forbidden under this chapter."  Mass. Gen. Laws ch. 151B, § 4(4).  Retaliation under Chapter 151B is governed by a similar burden-shifting framework as that discussed above.  "[I]n order to establish a prima facie case of retaliation under [the] Massachusetts anti-discrimination statute, [a plaintiff] 'must show that (1) he engaged in protected activity; (2) he suffered an

adverse employment action; and (3) a causal link existed between the protected activity and the adverse job action.'" Fantini v. Salem State Coll., 557 F.3d 22, 35 (1st Cir. 2009) (quoting Thompson v. Coca-Cola Co., 522 F.3d 168, 181 (1st Cir. 2008)).  At the pleading stage, the burden "is not intended to be onerous and the plaintiff need not establish every element of the prima facie case." Posada v. ACP Facility Servs., Inc., 389 F. Supp. 3d 149, 157–58 (D. Mass. 2019) (citing Sullivan, 825 N.E.2d at 530).

The parties do not dispute that Khan engaged in protected conduct in December 2021 when he internally reported discrimination.  [ECF No. 91 at 17]; see also Fantini, 557 F.3d at 36 ("[A plaintiff] engages in a protected activity 'if []he has opposed any practices forbidden under this chapter or . . . has filed a complaint, testified or assisted in any proceeding under [Mass. Gen. Laws ch. 151B, § 5].'"); Youngblood v. City of Bos. Pub. Sch., No. SUCV201500309C, 2016 WL 7189833, at *6 (Mass. Super. Ct. Oct. 31, 2016) ("Protected conduct may include filing a formal complaint . . . , 'complaining to management or filing an internal complaint . . . , or meeting with co-workers to discuss how to stop [forbidden practices] . . . .'" (quoting Ritchie v. Dept. of State Police, 805 N.E.2d 54, 62 (Mass. App. Ct. 2004))).  Khan has also made sufficient initial showings that he suffered an adverse employment action after filing his complaint and that the adverse action was causally related to his complaint.  Specifically, he has introduced evidence, in the form of emails and his own testimony, that, following his complaint, (1) he had trouble applying to jobs internally and being promoted, [ECF No. 106-21 at 4], and (2) he began receiving increasingly difficult and time-sensitive work from Hottel, [Khan Affidavit ¶ 22].  In light of the fact that the first step of the burden-shifting analysis is not meant to be onerous, and because the alleged adverse action occurred after Khan's complaint, the Court also finds that he has adequately demonstrated causation.

22

As such, the burden shifts to Defendants to provide a nondiscriminatory explanation for the actions that Khan alleges were taken against him, which they decline to do.  Rather, they insist that Khan's evidence amounts to "nothing, other than unsupported, conclusory allegations."  [ECF No. 118 at 16].  Defendants are correct that Khan's evidence is minimal, but at summary judgment, minimal evidence is still sufficient to create a genuine dispute of material fact.  As long as such a dispute is present, Defendants are not entitled to judgment as a matter of law on Khan's retaliation claims.

**IV.    CONCLUSION**

For the reasons set forth above, Defendants' motion for summary judgment is **<u>GRANTED</u>** as to Van Tuyl and otherwise **<u>DENIED</u>**.


**SO ORDERED.**

October 23, 2025                                         */s/ Allison D. Burroughs*
                                                         ALLISON D. BURROUGHS
                                                         U.S. DISTRICT JUDGE